IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
File No. _____

| | |
|---|---|
| WILLIE JAMES GRIMES,<br><br>           Plaintiff,<br><br>vs.<br><br>CITY OF HICKORY, FLOYD LUCAS, JR., in his official and individual capacities, TOM ADKINS, in his official and individual capacities, STEVE HUNT, in his official and individual capacities, STEVE BRYANT, in his official and individual capacities, L. DAVID HUFFMAN, in his official and individual capacities, COY REID, in his official and individual capacities, AL JEAN BOGLE, in her official and individual capacities, THE ESTATE OF BARBARA MACKIE TOWERY, PHYLLIS HICKS, in her official and individual capacities, JOHN DOE CORPORATION, in its capacity as Surety on the Official Bond of the Sheriff of Catawba County, and JACK DOE CORPORATION, in its capacity as Surety of the Official Bond of the Clerk of Court for Catawba County,<br><br>           Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>    **COMPLAINT**<br>   **(Jury Trial Demanded)** |

Plaintiff Willie James Grimes, complaining of Defendants, alleges the following:

**<u>INTRODUCTION</u>**

1.  In July 1988, Plaintiff Willie James Grimes ("Grimes") was wrongfully convicted and sentenced to life plus nine years imprisonment for the rape and kidnapping of Carrie Lee Elliott in Hickory, North Carolina on October 24, 1987.

2.  Grimes served 24 years in prison for crimes he did not commit.

3.        In 2012, the North Carolina Innocence Inquiry Commission referred Grimes' case to a hearing before a three-judge panel to determine his claim of innocence. On October 5, 2012, with the State's consent, the three-judge panel issued a unanimous decision that Grimes had proved by clear and convincing evidence that he was innocent of the rape and kidnapping of Carrie Lee Elliott.

4.        The actual rapist was Albert Turner, a man with a long criminal history, including convictions for multiple assaults, assault on a female, assault with a deadly weapon, breaking and entering, and resisting arrest. Because Turner was not prosecuted for raping Elliott, he continued his criminal activity. A few months after Grimes was convicted, Turner assaulted an elderly woman. By 2011, Turner had been convicted of many more violent crimes, including six additional convictions for assault on a female. Turner's criminal history includes the rape of a nine-year-old girl and multiple rapes of one of his girlfriends.

5.        At the time of Elliott's rape, Turner's brother was an officer with the Defendant Hickory Police Department ("HPD"), the law enforcement agency responsible for investigating the crime. Turner's brother was a long-time friend of Defendant Detective Steve Hunt, who was also an officer with the HPD. Hunt was the lead investigator assigned to Elliott's rape.

6.        Turner was initially the prime suspect in Elliott's rape. Two days after the crime, Defendant HPD shifted the focus of its investigation from Turner to Grimes, even though the victim's initial description of the rapist matched Turner, not Grimes.

7.        Defendant HPD recovered two of Turner's latent fingerprints from Elliott's apartment within hours of the crime. It determined that the latent fingerprints did not come from Grimes, but failed to check them against Turner's fingerprints. HPD did not disclose the exculpatory fingerprint evidence to Grimes' defense counsel before trial. HPD also failed to

2

collect and test other items handled by the rapist; Defendant Hunt instead threw evidence with potential exculpatory value in the trash.

8. Defendant HPD conducted a grossly inadequate investigation of Elliott's rape and then withheld exculpatory evidence from Grimes' attorney, resulting in Grimes' wrongful conviction in July 1988.

9. In December 1990, without a court order, the Catawba County Sheriff's Department ("CCSD") destroyed most of the evidence in the case. The destruction of the evidence occurred despite a motion by Grimes' defense counsel at the conclusion of the trial requesting DNA testing on the rape kit.

10. Defendant HPD retained a fingerprint card with the latent fingerprints recovered on the night of the crime.

11. Beginning in 2003, Grimes and others acting on his behalf made repeated requests to Defendant HPD for the physical evidence. Each time, HPD employees falsely responded that HPD did not have any evidence from the case.

12. In October 2011, following requests that spanned many years, Defendant HPD finally produced the fingerprint card after the Innocence Inquiry Commission requested a copy of their complete file in the Elliott rape.

13. The State Bureau of Investigation determined that the fingerprints on the card were Albert Turner's.

14. That finding triggered an investigation by the Innocence Inquiry Commission that resulted in Grimes' exoneration in October 2012.

3

15.     Grimes' ordeal could and should have been avoided.  He continually maintained his innocence and pleaded that all evidence from the crime scene and the victim be scientifically tested to confirm that he did not commit the crimes of which he was accused and convicted.

16.      This action seeks to compensate Willie James Grimes for the more than 24 years he spent in prison as a result of the wrongful acts and omissions of Defendants, and for the continuing effects of his wrongful incarceration.

17.     As a direct and proximate result of Defendants' negligent, willful, wanton, reckless, and deliberately indifferent acts and omissions, Grimes sustained injuries and damages, including, among others, the following: personal injuries, physical injuries, physical pain and mental suffering, severe emotional distress, loss of income, humiliation, indignities and embarrassment, degradation, and restrictions on all facets of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, reading, enjoyment of life, and expression of his own desires and interests.

## JURISDICTION AND VENUE

18.     Grimes brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived Grimes of his liberty without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

19.     Grimes' action arises under the Constitution and laws of the United States.

20.     This Court has original jurisdiction over Grimes' federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

21.     This case also arises under the common law of the State of North Carolina.  This Court has pendent jurisdiction over Grimes' state law claims pursuant to 28 U.S.C. § 1367.

22.     All material events giving rise to this cause of action occurred in Catawba County, North Carolina.

23.     Upon information and belief, Defendant Floyd Lucas, Jr. resides in Catawba County, North Carolina.

24.     Upon information and belief, Defendant Tom Adkins resides in Catawba County, North Carolina.

25.     Upon information and belief, Defendant Steve Hunt resides in Catawba County, North Carolina.

26.     Upon information and belief, Defendant Steve Bryant resides in North Adams, Massachusetts.

27.     Upon information and belief, Defendant L. David Huffman resides in Catawba County, North Carolina.

28.     Upon information and belief, Defendant Coy Reid resides in Catawba County, North Carolina.

29.     Upon information and belief, Defendant Phyllis Hicks resides in Catawba County, North Carolina.

30.     Upon information and belief, Barbara Mackie Towery, who served as Clerk of Court for Catawba County from 1990 until 1999, is deceased.

31.     Upon information and belief, Defendant Al Jean Bogle resides in Catawba County, North Carolina.

32.     Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Western District of North Carolina.

## PARTIES

33.    Plaintiff Willie James Grimes is a citizen and resident of Catawba County, North Carolina.  Grimes was born on August 23, 1946, and is now 68 years old.  Before he was imprisoned in 1988, Grimes was a resident of Catawba County, North Carolina.

34.    Defendant City of Hickory is a municipal entity organized under the laws of the State of North Carolina.

35.    Upon information and belief, Defendant Floyd Lucas, Jr. served as Chief of Police of the Hickory Police Department during the years 1987 through 2007.  During that time, Defendant Lucas was the final policymaker for the City of Hickory with respect to policing and law enforcement investigations within that jurisdiction.  Defendant Lucas is sued in his official and individual capacities.

36.    Upon information and belief, Defendant Tom Adkins served as Chief of Police of the Hickory Police Department during the years 2007 through 2011.  During that time, Defendant Adkins was the final policymaker for the City of Hickory with respect to policing and law enforcement investigations within that jurisdiction.  Defendant Lucas is sued in his official and individual capacities.

37.    Upon information and belief, Defendant Steve Hunt is a citizen and resident of Catawba County, North Carolina.  In 1987, Defendant Hunt worked as a Detective with the Hickory Police Department and in that role led the investigation into the assault of Carrie Elliott, which resulted in Plaintiff Grimes' arrest, conviction, and wrongful incarceration.  Defendant Hunt is sued in his official and individual capacities.

38.    Upon information and belief, Defendant Steve Bryant is a citizen and resident of North Adams, Massachusetts.  In 1987, Defendant Bryant worked in the Investigations unit of

6

the Hickory Police Department and in that role was involved in the investigation into the assault of Carrie Elliott, which resulted in Plaintiff Grimes' arrest, conviction, and wrongful incarceration. Defendant Bryant is sued in his official and individual capacities.

39. Upon information and belief, Defendant L. David Huffman, served as Sheriff of Catawba County during the years 1982 through 2010. Defendant Huffman is sued in his official and individual capacities. During the years 1982 through 2010, Defendant Huffman was the final policymaker for the Office of Sheriff of Catawba County and the Catawba County Sheriff's Department with respect to policing and law enforcement activities under the jurisdiction of the Catawba County Sheriff's Department. As Sheriff of Catawba County, Defendant Huffman was vested with final policymaking authority for the Catawba County Sheriff's Department and Catawba County with respect to maintenance, inventorying, storage, safekeeping, and destruction and disposition of crime scene evidence under the custody of the Catawba County Sheriff's Department.

40. Upon information and belief, Defendant Coy Reid currently serves as Sheriff of Catawba County and has served in that capacity since 2010. Defendant Reid is sued in his official and individual capacities. In his capacity as Sheriff of Catawba County, Defendant Reid is the final policymaker for the Office of Sheriff of Catawba County and the Catawba County Sheriff's Department with respect to policing and law enforcement activities under the jurisdiction of the Catawba County Sheriff's Department. As Sheriff of Catawba County, Defendant Reid is vested with final policymaking authority for the Catawba County Sheriff's Department and Catawba County with respect to maintenance, inventorying, storage, safekeeping, and destruction and disposition of crime scene evidence under the custody of the Catawba County Sheriff's Department.

7

41.     Defendant John Doe Corporation is a fictitious name for the Surety on the official bond of Defendant Reid as Sheriff of Catawba County pursuant to N.C. Gen. Stat. § 162-8 and § 58-76-5, whose identity is presently unknown to Plaintiff.  The true name of the corporation will be substituted for the fictitious name once the corporation's identity is learned.  Plaintiff is informed and believes that Defendants Huffman and Reid are protected by a bond issued by the Surety, and that the Surety is a corporation authorized to conduct business in the State of North Carolina.  Plaintiff institutes this action individually and, with respect to the claims on the official bond of Defendant Reid, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5, *et seq.*

42.     Upon information and belief, Defendant Phyllis Hicks served as Clerk of Court for Catawba County from 1986 until 1990.  Defendant Hicks is sued in her official and individual capacities.

43.     Upon information and belief, Defendant Barbara Mackie Towery served as Clerk of Court for Catawba County from 1990 until 1999.  Upon information and belief, Ms. Towery has passed away.  Accordingly, service will be made upon her estate.

44.     Defendant Al Jean Bogle currently serves as Clerk of Court for Catawba County and has served in that capacity since 1999.  Defendant Bogle is sued in her official and individual capacities.

45.     Defendant Jack Doe Corporation is a fictitious name for the Surety on the Official Bond of Defendant Bogle as Clerk of Court pursuant to N.C. Gen. Stat. § 7A-107, whose identity is presently unknown to Plaintiff.  The true name of the corporation will be substituted for the fictitious name once the corporation's identity is learned.  Plaintiff is informed and believes that Defendant Bogle, and previously Hicks and Towery, are protected by a bond issued by the

8

Surety, and that the Surety is a corporation authorized to conduct business in the State of North Carolina. Plaintiff institutes this action individually and, with respect to the claims on the official bond, also on behalf of the State of North Carolina pursuant to N.C. Gen. Stat. § 58-76-5, *et seq*.

46.     At all times relevant hereto, in committing the acts and omissions herein alleged, each of the Defendants was acting within the scope of his or her employment and under color of law.

47.     Upon information and belief, Defendants are insured by one or more policies of liability insurance purchased pursuant to N.C. Gen. Stat. § 153A-435 or other applicable state law with respect to all acts and omissions complained of herein, or participate in a government risk pool pursuant to N.C. Gen. Stat. § 58-23-5, or maintain a funded reserve and to such extent, Defendants have waived any official, sovereign, qualified or governmental immunity to which they might otherwise be entitled in their official capacities. To the extent that may be required by law, Plaintiff hereby waives the right to a jury trial on all issues of law or fact relating to insurance coverage.

## FACTS

### A.     Albert Turner Rapes Carrie Elliott.

48.     The allegations in the preceding paragraphs are incorporated by reference.

49.     At approximately 9:00 p.m. on October 24, 1987, Albert Turner, a black man, knocked on the apartment door of a 69-year-old white woman, Carrie Lee Elliott, in Hickory, North Carolina. When Elliott went to the door, Turner forcibly entered the apartment.

50.     Turner threatened Elliott with a knife and raped her on the living room sofa, and then dragged her to the bedroom where he raped her a second time.

9

51.     During the assault, Turner removed his shirt, exposing his chest.  Before leaving Elliott's apartment through the back door, he handled fruit in a bowl in the kitchen and took bananas and an apple with him.  He also left behind two bananas and an apple, which he had touched.

52.     Turner left Elliott's apartment through the back door at approximately 9:17 p.m.  Elliott immediately called her daughter-in-law, who in turn telephoned the Hickory Police Department.

**B.     The Hickory Police Department Conducts a Reckless Investigation.**

53.     HPD Detective Steve Hunt was the lead detective in charge of the Elliott investigation and case.  At the time of this investigation, Detective Hunt was a long-time friend of Robert Turner, an HPD police officer and the brother of the actual rapist, Albert Turner.

54.     Officer Susan Moore of the Hickory Police Department was the first law enforcement officer to arrive at Elliott's apartment, entering within 30 minutes of the attack.  Officer Moore proceeded to interview Elliott about the assault and her assailant.  In describing her attacker, Elliott did not describe him as having any of Plaintiff Grimes' distinguishing characteristics: a large mole on his face, a large scar on his chest, missing two fingertips from his right hand, or a speech impediment.

55.     Shortly after the interview with Officer Moore, Officer Jeff Blackburn, also of the Hickory Police Department, interviewed Elliott.  During this interview, Elliott described her assailant as follows: black male; approximately 6 feet tall; 200-225 pounds; approximately 35 years' old; very dark skin; bushy hair; needed to shave; very large build; smelled of alcohol; wearing dark pants and a green pullover.  This description was inconsistent with Grimes' appearance: Grimes was six feet two inches tall, and at the time of the crime did not have a large

build, weighing only about 165 pounds. Again, Elliott did not describe her assailant as having a prominent mole on his face, a large scar on his chest, a speech impediment, or any missing fingertips.

56.     HPD crime scene technician Jack Holsclaw processed Elliott's apartment for trace evidence, including fingerprints and hair. Holsclaw recovered latent fingerprints from bananas left on the kitchen table and hairs from Elliott's bed sheet.

57.     Elliott told the HPD investigators that the rapist handled and had taken some fruit from a bowl in her kitchen before leaving through the back door. The bowl on Elliott's table contained apples and bananas. Detective Hunt observed two banana peels on a walkway leading from Elliott's back door. Hunt recognized that these items may have been left by Elliott's rapist; however, he inexplicably did not collect them. Hunt also saw an apple core in the middle of the street near Elliott's home. Recognizing that the apple may have been left by Elliott's rapist, he brought the apple core to the Hickory Police Department, where he put it in a trashcan, destroying the evidence. The banana peels were never collected by any law enforcement officer.

58.     Officer Blackburn showed Elliott a six-man photo lineup that did not include a photograph of Grimes, but did include a photograph of Albert Turner. At the time, it was the general procedure of the Hickory Police Department to incorporate the prime suspect into the photo lineup with similar-looking individuals. Turner matched the physical description given by Elliott; was known to frequent the area where Elliott lived; and had a long criminal history, including convictions for multiple assaults, assault on a female, breaking and entering, and assault with a deadly weapon.

59.     The HPD used a photo of Turner in the lineup that did not accurately depict how he appeared in 1987. The photo, taken in 1985, showed Turner with plaited hair. Turner wore

his hair "bushy" in 1987 at the time of the rape and the photo line-up, as is reflected in a 1988 arrest photo on file with the Hickory Police Department. Elliott did not identify any of the six photos, including the dated photo of Turner, as being of her assailant.

60.    On October 26, 1987, two days after her assault, Elliott spoke with a neighbor, Linda McDowell, about the assault. At the time, McDowell had been working as a "confidential source" or "informant" for Defendant Detective Steve Bryant. McDowell told Elliott that she (McDowell) may know the rapist. McDowell refused to reveal the person's name, saying she would only provide the name directly to the Hickory Police Department.

61.    Elliott then called Officer Steve Bryant of the Hickory Police Department. She mentioned, for the first time, that the rapist had a mole on the side of his face. She said she scratched his face, breaking a fingernail.

62.    Elliott only mentioned the mole after she had spoken with McDowell, who knew Grimes, was an informant for Officer Bryant, and had a financial motive to identify Elliott's assailant. Contrary to Elliott's revised account, her medical records from the night of the crime do not reflect that she had broken any fingernails.

63.    Later that day, McDowell called Officer Bryant and told him she knew a man who fit the assailant's description. At 4:30 p.m. on October 26, 1987, McDowell went to the Hickory Police Department and told Officer Bryant that Grimes fit the assailant's description.

64.    After identifying Grimes, McDowell received $1,000 in reward money as compensation. Before he was named by McDowell, Grimes was not considered a suspect by the HPD.

65.    A few hours later, at approximately 8:15 p.m., Officer Bryant met with Elliott at her apartment and showed her a six-man photo lineup that included a photo of Grimes. Grimes'

12

photo was the only photo in the lineup of an individual with a mole on his face. When Elliott identified Grimes' photo, the HPD issued a warrant for Grimes' arrest.

**C.**     **Grimes Is Arrested for the Rape of Carrie Elliott, but the HPD Fails to Investigate Evidence Proving Grimes' Innocence.**

66.     When the assault on Elliott occurred, Grimes was more than a mile away, at the home of Rachel Wilson, where Grimes spent the evening with Rachel Wilson, Brenda Smith, Carolyn Shuford, and William Robinson. All of those individuals confirmed that Grimes remained at Rachel Wilson's house from 8:30 to midnight, other than a several-minute visit Grimes made to the home of Richard Wilson three houses down from Rachel Wilson's home. Richard Wilson confirmed that Grimes came to his home around 9 p.m. that evening to pick up some money from him and stayed for a few minutes.

67.     Grimes had no car at the time and no access to a car. It would have been physically impossible for Grimes to go to and return from Elliott's apartment during the very brief period of time he was not at the homes of Rachel Wilson or Richard Wilson.

68.     On October 27, 1987, after learning of the arrest warrant the day after it was issued, Grimes voluntarily went to the Hickory Police Department to speak with Detective Hunt. Grimes proclaimed his innocence, but Hunt never took an official statement from Grimes. Grimes asked to take a polygraph exam, but one was not given. Hunt simply asked Grimes for his height and weight. By not interviewing Grimes, Hunt never learned of or investigated Grimes' alibi or alibi witnesses.

69.     None of the investigating or arresting officers indicated Grimes had scratches on his face or any part of his body and his arrest photo does not show any scratches. When Detective Hunt arrested Grimes, he did not have Elliott view an in-person line-up to determine whether she could accurately identify Grimes as her assailant.

13

70.     Before his arrest, Grimes had no criminal record other than two DWI convictions from September 1982 and March 1985, a citation for having a blue light in his vehicle from the early 1970's (a flashlight with blue tape over the light), a dismissed trespass charge from 1985, and a larceny charge in 1971 while in the military.  Unlike Turner, Grimes had no history of violence.

71.     Soon after Grimes' arrest, Holsclaw examined the latent fingerprints recovered from the bananas left on Elliott's kitchen table and identified two prints "of value."  Holsclaw compared the two fingerprints to Grimes' fingerprints and determined he could not have left the fingerprints on the bananas.  Holsclaw told Detective Hunt about the results of his fingerprint analysis.  HPD investigators never compared the two fingerprints to Turner.

72.     On November 2, 1987, Holsclaw submitted the following evidence to the SBI: (a) Elliott's underwear; (b) crime scene hair samples; (c) the rape kit; and (d) Elliott's nightgown and robe.  The SBI returned this evidence to the Hickory Police Department before trial.

73.     On November 17, 1987, three weeks after the assault, a probable cause hearing was held.  Elliott was unable to definitively identify Grimes, saying only that he "looked like" her attacker.  Grimes sat next to his attorney and wore prison garb and handcuffs.

74.     Hoping to prove Grimes' innocence, or at least prompt the Hickory Police Department to reopen the investigation, Grimes' attorney, E.X. de Torres, provided to the Catawba County District Attorney's Office affidavits of six witnesses who were with Grimes on the evening of October 24, 1987.  However, no one from the HPD or the District Attorney's Office interviewed a single alibi witness.  No further investigation was conducted after Grimes was arrested.  Detective Hunt would later explain that "this case came together fairly quickly."

14

**D.** **The HPD Fails to Disclose Exculpatory Evidence to Grimes' Attorney Before Trial, Consistent with its Practice.**

75.     During and around the time of the Elliott rape investigation and prosecution of Grimes, the HPD had a policy requiring police officers, upon the initiation of criminal charges, to submit to the District Attorney's Office all typed reports concerning the case, including incident reports, supplemental reports, arrest reports, lab reports, and medical examiner and autopsy reports.

76.     The materials produced by the HPD police officers would then be available for inspection by criminal defendants and their counsel under the Catawba County District Attorney's "open file" policy.

77.     Under HPD's official policy, police officers were permitted to withhold handwritten notes, telephone memos, unwritten forensic test results, and other information from the prosecution.  In accordance with the policy, such information compiled in investigations would not be available for inspection by criminal defendants and their counsel even when the materials contained exculpatory evidence.

78.     Pursuant to this policy, HPD officers withheld from the District Attorney's Office the fingerprints found at the crime scene and the fact that the fingerprints did not match Grimes' fingerprints.  As a result, Grimes and his attorney were not aware of the fingerprints' existence before trial or that the fingerprints did not match Grimes, were never provided copies of the fingerprints, and did not have the opportunity to conduct additional tests on the fingerprints before trial.

79.     Pursuant to this policy, HPD officers withheld from the District Attorney's Office the initial photo lineup card, which indicated that Turner was the original suspect in the case. Detective Hunt maintained a personal investigative file on the Elliott rape containing documents

15

not included in the HPD's file, which contained the initial lineup card. As a result, Grimes and his attorney were not aware before trial that Turner was considered a suspect by the HPD and thus did not investigate whether Turner committed the crime.

80.     Pursuant to this policy, HPD officers withheld from the District Attorney's Office the fact that Linda McDowell was a paid informant for the HPD. As a result, Grimes and his attorney were not aware before trial that McDowell had a motivation to implicate Grimes and thus did not investigate whether McDowell caused Elliott's misidentification of Grimes as her assailant.

81.     On November 20, 1987, Grimes' attorney, E.X. de Torres, requested that the District Attorney's Office and HPD produce in discovery all forensic evidence and test results, as well as any other disclosure required in the interests of justice. De Torres was informed that the District Attorney's Office would follow its open file policy, but was not provided with any of the exculpatory evidence described in paragraphs 78-80.

82.     De Torres subsequently asked the District Attorney's Office to provide additional discovery in the case, specifically including any fingerprints, results from fingerprint tests, and exculpatory evidence. The District Attorney's Office referred de Torres to Detective Hunt. When de Torres attempted to obtain additional discovery from Hunt, Hunt rudely told de Torres, "You're not getting any [material] from me."

83.     De Torres never received any of the exculpatory evidence described in paragraphs 78-80 from the District Attorney's Office and HPD before trial.

84.     Pursuant to the policy described above, HPD officers withheld from the District Attorney's Office, and thus the defendant, exculpatory evidence in other cases, including State v.

Chapman (92-CRS-18186, the Ramseur murder case) and State v. Chapman (93-CRS-11980, the Conley murder case).

**E.    Grimes Is Tried and Convicted.**

85.    Grimes' case was called for trial on July 5, 1988.  The trial lasted four days and Grimes was convicted on July 8, 1988.  The jury found Grimes guilty of two counts of first-degree rape and one count of first-degree kidnapping.

86.    During the trial, the State's witnesses testified that they only considered Grimes a suspect after McDowell gave the HPD his name.  However, at no time before or during trial did Defendants Hunt or Bryant or anyone with the HPD disclose to Grimes' attorney that McDowell was a paid informant for the HPD.

87.    During the trial, Holsclaw discussed the fingerprints he pulled from the bananas in Elliott's kitchen.  Holsclaw testified that the fingerprints did not match Grimes' fingerprints, and that the HPD did not compare these fingerprints with Elliott's or any suspect other than Grimes.  Grimes and his attorney were not aware of the fingerprints' existence before trial or that the fingerprints did not match Grimes, and were never provided copies of the fingerprints.

88.    On July 12, 1988, the trial court sentenced Grimes to a consolidated "natural life" sentence for the rape charges and arrested judgment on the first-degree rape conviction and sentenced him to nine years for second-degree kidnapping.   Grimes' attorney immediately moved to have the physical evidence undergo forensic testing; to gain access to the fingerprints collected from the crime scene; and to submit the fingerprints collected from the crime scene to the FBI to compare against prints maintained in their records.  The trial court did not grant Grimes' motion.

17

**F.**   **After the Trial, the Sheriff's Department Destroys Most of the Evidence.**

89.   The Clerk of Court of Catawba County retained custody of evidence admitted at Grimes' trial, including the rape kit, victim's panties, hair sample, and victim's clothing. At some point between 1988 and 1991, employees in the Clerk's Office sent this evidence to CCSD for destruction, even though no court had issued an order authorizing the destruction. The Clerk's Office failed to maintain any record of the sending of evidence to the CCSD or the destruction of the evidence.

90.   From 1986 to 1990, the office of the Clerk of Court of Catawba County misfiled and/or lost numerous items of evidence, including $18,000, which resulted in an investigation by the SBI. This mismanagement of evidence was due to a systemic lack of organization of evidence that was supposed to have been maintained by the Clerk.

91.   It was CCSD's policy not to destroy evidence unless a judge issued a destruction order permitting its disposal. Whenever a destruction order would issue, CCSD would destroy the evidence, attach a copy of the destruction order to the case file, and keep another copy of the destruction order for the department's own records.

92.   On December 13, 1990, CCSD destroyed most of the evidence in Grimes' case. No court order had been issued authorizing the destruction. Referring to the absence of a court order, Catawba County Court Clerk Al Jean Bogle later observed, "It's a mystery to me why we don't have it."

93.   Defendant HPD retained a fingerprint card with the latent fingerprints recovered on the night of the crime. Detective Hunt retained his own personal file for the case that contained additional materials, including the initial photo lineup card indicating that Turner was originally the prime suspect.

18

**G.** **Defendants Repeatedly Refuse to Provide Grimes Access to the Evidence that Would Have Proved His Innocence.**

94.     Following his conviction, Grimes sought to prove his innocence through the examination and forensic testing of crime scene evidence.

95.     Grimes contacted North Carolina Prisoner Legal Services ("NCPLS") in 1989. NCPLS reviewed his claim and closed his case in 1991.

96.     At Grimes' request, in early 1991, de Torres contacted the Clerk of Court of Catawba County to again request access to crime scene evidence. The Clerk's Office told De Torres that all evidence had been destroyed.

97.     In 1994, Grimes filed a pro se motion seeking appointment of counsel to assist him with his post-conviction efforts, but that motion was denied. Grimes filed a pro se habeas petition and that was denied. Grimes' trial attorney, de Torres, supported Grimes' clemency efforts to no avail.

98.     In early 2003, with the help of a friend, Grimes made contact with the North Carolina Center on Actual Innocence (the "Center"). From that point forward, Center staff regularly contacted the Catawba County Clerk's Office, HPD and CCSD in search of any remaining crime scene evidence.

99.     Acting on Grimes' behalf, staff members for the Center made numerous efforts to locate any remaining crime scene evidence in 2003, 2004, 2005, 2006, and 2007, including repeated inquiries to the Catawba County Clerk of Court, HPD and CCSD. In October 2007, at the suggestion of the CCSD, Center staff contacted Detective Hunt, who stated that he did not know where the evidence was located.

100.    Center staff continued their efforts to ascertain the location of crime scene evidence in 2007, 2008, 2009, 2010 and 2011. During that period, Center staff regularly made

inquiry with the Catawba County Clerk of Court, HPD and CCSD, seeking information regarding either the location or the disposition of crime scene evidence. Specifically, Center staff requested access to any remaining crime scene evidence and the production of any destruction order with respect to any evidence that may have been destroyed.

101. On October 5, 2011, North Carolina Innocence Inquiry Commission ("NCIIC" or "Commission") staff contacted HPD Chief Tom Adkins by email to inquire about crime scene evidence in the Grimes case. On October 12, 2011, Captain Thurman Whisnant responded by stating that all evidence had been turned over to the Clerk's Office with the exception of latent fingerprints and film of crime scene photos. On October 12, 2011, Commission staff confirmed that a print card with two fingerprint lifts still existed and was under HPD control. The fingerprints had been under the custody of the HPD ever since Grimes' conviction in 1988.

102. On October 14, 2011, Commission staff contacted the District Attorney and requested that the fingerprints be examined. The District Attorney agreed to submit the prints to the State Bureau of Investigation ("SBI") and the HPD transferred the latent lifts to the SBI Western Lab.

103. On December 13, 2011, the Commission received an email from Assistant District Attorney Eric Bellas with an SBI report attached showing the results of an AFIS comparison and the fingerprint analysis. The report stated that one of the latent prints "was identified as having been made by the left index finger of Albert Lindsey Turner." The other print was "identified as having been made by the left middle finger of Albert Lindsey Turner." That same day, the Commission's Director moved the case into formal inquiry and Grimes was given notice of his right to counsel.

104. Grimes' claim of innocence was heard before the North Carolina Innocence Inquiry Commission on April 2, 3, and 4, 2012 pursuant to N.C. Gen. Stat. § 15A-1460, *et seq*.

105. Following presentation of evidence during a three-day evidentiary hearing, the Commission concluded by a unanimous decision that there was sufficient evidence of factual innocence to merit further judicial review. That decision was memorialized in an Opinion filed on April 11, 2012.

106. Grimes' case then proceeded to a hearing before a three-judge panel pursuant to N.C. Gen. Stat. § 15A-1469. The three-judge panel conducted proceedings and heard evidence on October 1, 2, 3, and 4, 2012. On October 5, 2012, the State agreed Grimes had met his burden and proved by clear and convincing evidence that he is innocent. District Attorney Jay Gaither reported to the panel: "The State cannot argue any conclusion other than for innocence in the case of Willie Grimes."

107. On October 5, 2012, the three-judge panel issued the following Decision:

> The unanimous decision of the three-judge panel of the Superior Court Judges is that the defendant, Willie James Grimes, the convicted person, has proved by clear and convincing evidence that he is innocent of the rape and kidnapping of Mrs. Carrie Lee Elliott on October 24, 1987.

> IT IS THEREFORE ORDERED, pursuant to the decision of the three-judge panel and N.C. Gen. Stat. § 15A-1469, that the relief sought by the convicted person, Willie James Grimes, is granted and that the charges of rape and kidnapping of Mrs. Carrie Lee Elliott on October 24, 1987 against Willie James Grimes are dismissed. It is further ordered that Willie James Grimes shall be removed from the Sex Offender and Public Protection Registration Program, pursuant to § 14-208.6C, effective immediately.

108. Thus, more than 24 years after his July 8, 1988 conviction, Grimes was exonerated. Including time spent in jail awaiting trial, Grimes spent nearly one quarter of a century in prison for crimes of which he was completely innocent.

109. Due to the wrongful acts and omissions and misconduct of Defendants Hunt and Bryant, the City of Hickory, and other responsible officials with the Hickory Police Department, including Chief of Police Floyd Lucas, Jr. and Chief of Police Tom Adkins, Grimes was falsely arrested and wrongfully tried for the rape of Carrie Lee Elliott. Due to the negligence, wrongful acts and omissions, and misconduct of those same Defendants and Sheriff L. David Huffman and Sheriff Coy Reid and other responsible officials with the Catawba County Sheriff's Department and the Catawba County Clerk's Office, including Clerks Phyllis Hicks, Barbara Mackie Towery, and Al Jean Bogle, Grimes was wrongfully denied access to the evidence that would have led to his earlier exoneration and release from custody.

## FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law by Failing to Investigate in Violation of the Fourteenth Amendment - Hunt, Bryant)**

110. The allegations in the preceding paragraphs are incorporated by reference.

111. Defendants Hunt and Bryant deliberately and/or recklessly failed to conduct a constitutionally adequate criminal investigation, thereby violating Plaintiff Grimes' Fourteenth Amendment right not to be deprived of liberty without due process of law and to a fair criminal trial.

112. Specifically, in 1987 and continuing through Grimes' trial in July 1988, these Defendants deliberately and/or recklessly failed to investigate information and leads that they knew, or in the absence of their deliberate or reckless indifference should have known, tended to prove Grimes' innocence. The investigative failures of Defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by Grimes' alibi witnesses; failing to investigate exculpatory and potentially exculpatory forensic

22

evidence, including but not limited to the fingerprint evidence recovered from fruit at the crime scene; and failing to pursue evidence and leads concerning other suspects, including Turner.

113.    At all relevant times, the Hickory Police Department Defendants, including Hunt and Bryant, had in their possession fingerprints which confirmed that Albert Turner was the perpetrator of the rape for which Plaintiff Grimes was arrested, tried, and convicted. Turner would have been identified as the actual rapist if the Hickory Police Department and Defendants Hunt and Bryant had simply checked the prints against Turner, an individual whose identity as an initial suspect was kept hidden in a personal investigative folder retained by Defendant Hunt.

114.    Defendants' acts were undertaken with deliberate and/or reckless indifference to Plaintiff Grimes' constitutional rights.

115.    When Defendants engaged in the misconduct referenced above, they could reasonably foresee that the failure to conduct a constitutionally adequate investigation would result in Grimes' conviction.

116.    Defendants' misconduct was a direct and proximate cause of Grimes' conviction and his subsequent imprisonment. If Defendants had undertaken a constitutionally adequate investigation, the actual perpetrator of the Elliott rape would have been tried and convicted and Grimes would have been cleared of any wrongdoing

117.    Defendants were acting under color of state law when they conducted a constitutionally inadequate investigation. Defendants' misconduct deprived Grimes of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

118.    Because Defendants failed to conduct a constitutionally adequate criminal investigation, Defendants are liable to Grimes for damages under 42 U.S.C. § 1983.

23

## SECOND CAUSE OF ACTION
**(42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process of Law by Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments - Hunt, Bryant)**

119.    The allegations in the preceding paragraphs are incorporated by reference.

120.    Defendants Hunt and Bryant withheld material exculpatory evidence from the District Attorney's Office and failed to investigate information that tended to prove Grimes' innocence, which caused the District Attorney's Office to pursue a prosecution against Grimes, thereby violating Plaintiff Grimes' Fourteenth Amendment right not to be deprived of liberty without due process of law.

121.    Specifically, in 1987 and continuing through Grimes' trial in July 1988, these Defendants deliberately and/or recklessly failed to investigate information and leads that they knew, or in the absence of their deliberate or reckless indifference should have known, tended to prove Grimes' innocence. The investigative failures of Defendants included but were not limited to failing to investigate known exculpatory and potentially exculpatory information provided by Grimes' alibi witnesses; failing to investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to the fingerprint evidence recovered from fruit at the crime scene; and failing to pursue evidence and leads concerning other suspects, including Turner.

122.    These Defendants chose not to disclose to the District Attorney's Office that Linda McDowell was a paid informant of the Hickory Police Department and that she had been paid $1,000 for the information she provided to the Hickory Police Department. These same Defendants chose not to disclose to the District Attorney's Office before trial that fingerprints suitable for testing were lifted from the bananas inside Elliott's apartment and that the fingerprints did not match Grimes. These same Defendants chose not to disclose to the District Attorney's Office that Albert Turner was considered a suspect for the Elliott rape because he

24

matched the initial physical description given by Elliott; had a violent criminal history; and was a regular presence in Elliott's neighborhood. Defendants knew or should have known that this evidence was exculpatory.

123.    Defendants' acts were undertaken with deliberate and/or reckless indifference to Plaintiff Grimes' constitutional rights. When Defendants engaged in the misconduct referenced above, they could reasonably foresee that the failure to disclose exculpatory evidence would result in Grimes' indictment, prosecution, and conviction. Defendants were acting under color of state law when they engaged in the misconduct referenced above.

124.    Defendants' misconduct was a direct and proximate cause of Grimes' indictment, prosecution, conviction and subsequent imprisonment. If Defendants had disclosed the exculpatory evidence to the District Attorney's Office and conducted a reasonable investigation, Grimes would not have been indicted, prosecuted and convicted, and Grimes would have avoided 24 years in prison.

125.    Defendants' misconduct subjected Grimes to unreasonable seizure and deprived Grimes of his liberty without due process of law in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

126.    Because Defendants wrongfully caused the prosecution of Grimes, Defendants are liable to Grimes for damages under 42 U.S.C. § 1983.

**THIRD CAUSE OF ACTION**
**(42 U.S.C. § 1983 Claim for Deprivation of Liberty Without Due Process by Withholding Exculpatory Evidence in Violation of the Fourteenth Amendment - Hunt, Bryant)**

127.    The allegations in the preceding paragraphs are incorporated by reference.

128.    Defendants Hunt and Bryant intentionally and in bad faith withheld material exculpatory evidence, thereby violating Plaintiff Grimes' Fourteenth Amendment right not to be deprived of liberty without due process of law and to a fair criminal trial.

129.    Specifically, in 1987 and continuing through Grimes' trial in July 1988, these Defendants chose not to disclose to Plaintiff Grimes or his trial counsel that Linda McDowell was a paid informant of the Hickory Police Department and that she had been paid $1,000 for the information she provided to the Hickory Police Department.  These same Defendants chose not to disclose before trial to Plaintiff Grimes or his trial attorney that fingerprints suitable for testing were lifted from the bananas inside Elliott's apartment and that the fingerprints did not match Grimes.  These same Defendants chose not to disclose to Plaintiff Grimes or his trial attorney that Albert Turner was considered a suspect for the Elliott rape because he matched the initial physical description given by Elliott; had a violent criminal history; and was a regular presence in Elliott's community.  Defendants knew or should have known that this evidence was exculpatory.

130.    Defendants' acts were undertaken with deliberate and/or reckless indifference to Plaintiff Grimes' constitutional rights.  When Defendants engaged in the misconduct referenced above, they could reasonably foresee that the failure to disclose exculpatory evidence would result in Grimes' conviction.  Defendants were acting under color of state law when they withheld exculpatory evidence.

131.    Defendants' misconduct was a direct and proximate cause of Grimes' conviction and his subsequent imprisonment.  If Defendants had disclosed the exculpatory evidence so that Grimes' trial counsel could have made use of the evidence at trial, Grimes would not have been convicted and Grimes would have avoided 24 years in prison.

132. In each year after Grimes' conviction, including 1989, 1990, 1991, 1992, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, and 2011, Defendants, acting under color of state law, intentionally failed to disclose exculpatory evidence. If they had disclosed exculpatory evidence, Grimes would have obtained post-conviction relief and avoided additional time in prison.

133. Defendants' misconduct from 1987 through 2011 deprived Grimes of his liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution.

134. Because Defendants wrongfully withheld exculpatory evidence from 1987 through 2011, Defendants are liable to Grimes for damages under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 <u>Monell</u> Claim -- Withholding of Exculpatory Evidence in Violation of the Fourteenth Amendment – City of Hickory, Lucas, Adkins)

135. The allegations in the preceding paragraphs are incorporated by reference.

136. During the years in which Defendants Floyd Lucas, Jr. and Tom Adkins held the positions of Chief of Police of the Hickory Police Department, they were the final policy-makers with respect to law enforcement and criminal investigations for the Defendant City of Hickory.

137. During the time in which Defendants Floyd Lucas, Jr. and Tom Adkins held the positions of Chief of Police of the Hickory Police Department, they were the final policy-makers and their actions and omissions constituted policy decisions that had the Defendant City of Hickory's "stamp of approval."

138. Under City of Hickory's official policy, police officers were permitted to withhold handwritten notes, telephone memos, unwritten forensic test results, and other information from the prosecution. In accordance with that policy, handwritten notes, telephone

27

memos, and unwritten forensic test results, and other information compiled by City of Hickory police officers in investigations would not be available for inspection by criminal defendants and their counsel even when it was exculpatory evidence.

139. Due to City of Hickory's official policy, police officers withheld exculpatory evidence from the prosecution in order to avoid producing the evidence to criminal defendants and their counsel, in violation of the due process clause in the Fourteenth Amendment to the United States Constitution.

140. The practice of withholding exculpatory evidence by police officers at the HPD was persistent and widespread in the period surrounding Grimes' conviction as demonstrated by officers' conduct in multiple cases, including the case against Grimes and the two murder cases against Glen Chapman. Defendants City of Hickory, Lucas, and Adkins condoned and failed to address officers' practice at the HPD of withholding exculpatory evidence from the prosecution and thus the defendant. Defendants' conduct constituted deliberate indifference.

141. In the period surrounding Grimes' conviction, Defendants City of Hickory, Lucas, and Adkins failed to adequately train officers at the HPD about their obligations to disclose exculpatory material. As a result of this failure, officers at the HPD repeatedly failed to disclose exculpatory material in multiple cases, including the case against Grimes and the two murder cases against Glen Chapman.

142. As a direct result of the unconstitutional municipal policy of the City of Hickory, the condonation of officers' failure to disclose exculpatory material, and/or the failure to train officers about their obligation to disclose exculpatory material, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.

28

Defendants City of Hickory, Lucas, and Adkins are thus liable to Plaintiff pursuant to 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Monell Claim -- Failing to Produce Available Evidence Upon Request in Violation of the Fourteenth Amendment – City of Hickory, Lucas, Adkins)

143.    The allegations in the preceding paragraphs are incorporated by reference.

144.    Defendants City of Hickory, Lucas, and Adkins created, promulgated, and maintained the following policies or practices which deprived Plaintiff Grimes of due process and of his constitutional right to access the courts:

(a)    Defendants created, promulgated, and maintained a policy or practice of failing to properly and reasonably inventory, organize, and safe-keep evidence;

(b)    Defendants created, promulgated, and maintained a policy or practice of not maintaining, storing, and safekeeping evidence used to subject persons to life sentences;

(c)    Defendants created, promulgated, and maintained a policy or practice of failing to make DNA evidence available to individuals upon request as required by N.C. Gen. Stat. § 15A-269;

(d)    Defendants created, promulgated, and maintained a policy or practice of failing to make evidence available for scientific testing and analysis;

(e)    Defendants created, promulgated, and maintained a policy or practice of allowing the transfer, disposition, and destruction of evidence without requisite documentation and authorization;

(f)    Defendants created, promulgated, and maintained a policy or practice of failing to provide accurate and prompt responses to reasonable requests regarding the existence of evidence under Defendants' possession, custody, or control; and

(g)    in other respects to be proved through discovery and at trial.

145.    Defendants had in their possession evidence that would have proved Grimes' innocence of the crimes for which he was convicted and imprisoned.

29

146.    Grimes and his agents repeatedly requested that he be provided access to the evidence so that it could be subjected to DNA and other scientific testing.  Defendants, through neglect, misconduct, and the adherence to unconstitutional policies, customs, and practices, falsely represented that the HPD did not have the evidence, and prevented Grimes from having access to evidence that would have exonerated him.

147.    Because of Defendants' misconduct, Grimes could not file a Motion for Appropriate Relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c).  Such a motion based on the DNA testing of crime scene evidence or other scientific testing such as fingerprint analysis would have been successful, and would have freed Grimes from prison.  Defendants' misconduct thus violated Grimes' rights to due process and to access the courts under the Fourteenth Amendment to the United States Constitution.

148.    As a direct result of the unconstitutional municipal policies and/or practices of the City of Hickory, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.  Defendants City of Hickory, Lucas, and Adkins are thus liable to Plaintiff pursuant to 42 U.S.C. § 1983.

## SIXTH CAUSE OF ACTION
### (42 U.S.C. § 1983 Monell Claim -- Due Process - Huffman, Reid)

149.    The allegations in the preceding paragraphs are incorporated by reference.

150.    During the years in which Defendants L. David Huffman and Coy Reid held the positions of Sheriff of Catawba County, they were the final policy-makers with respect to law enforcement activities for the Catawba County Sheriff's Department and the Office of Sheriff of Catawba County.

151.    During the time in which Defendants L. David Huffman and Coy Reid held the positions of Sheriff of Catawba County, they were the final policy-makers and their actions

30

constituted policy decisions that had the "stamp of approval" of the Office of Sheriff of Catawba County.

152.     As final policy-maker for the Office of Sheriff of Catawba County, Defendants Huffman and Reid created, promulgated, and maintained the following policies which deprived Plaintiff Grimes of his constitutional rights, including but not limited to, his due process rights and the right to not be subject to improper deprivations of liberty and the pursuit of happiness:

(a)     Defendants created, promulgated, and maintained a policy or practice of failing to properly and reasonably inventory, organize, and safe-keep evidence;

(b)     Defendants created, promulgated, and maintained a policy or practice of not maintaining, storing, and safekeeping evidence used to subject persons to life sentences;

(c)     Defendants created, promulgated, and maintained a policy or practice of failing to make DNA evidence available to individuals upon request as required by N.C. Gen. Stat. § 15A-269;

(d)     Defendants created, promulgated, and maintained a policy or practice of failing to make evidence available for scientific testing and analysis;

(e)     Defendants created, promulgated, and maintained a policy or practice of disposing of and destroying evidence without proper authority, such as a court order issued after notice to criminal defendants and their attorneys of contemplated destruction of evidence;

(f)     Defendants created, promulgated, and maintained a policy or practice of failing to provide accurate and prompt responses to reasonable requests regarding the existence of evidence under Defendants' possession, custody, or control; and

(g)     in other respects to be proved through discovery and at trial.

153.     Defendants had in their possession evidence that would have proved Grimes' innocence of the crimes for which he was convicted and imprisoned.  Defendants destroyed this evidence without a court order and without first notifying Grimes or his attorney of the contemplated destruction of evidence.

31

154.     Because of Defendants' misconduct, Grimes could not file a Motion for Appropriate Relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c).  Such a motion based on the DNA testing of crime scene evidence or other scientific testing such as fingerprint analysis would have been successful, and would have freed Grimes from prison.  Defendants' misconduct thus violated Grimes' rights to due process and to access the courts under the Fourteenth Amendment to the United States Constitution.

155.     As a direct result of the unconstitutional policies and/or practices of Defendants, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.  Defendants City of Huffman and Reid are thus liable to Plaintiff pursuant to 42 U.S.C. § 1983.

### SEVENTH CAUSE OF ACTION
**(42 U.S.C. § 1983 Monell Claim -- Due Process - Hicks, Towery, and Bogle)**

156.     The allegations in the preceding paragraphs are incorporated by reference.

157.     During the years in which Defendants Hicks, Towery, and Bogle held the positions of Clerk of Court of Catawba County, they were charged with performing the ministerial functions of maintaining evidence admitted at trial in cases tried in Catawba County Superior Court.  Their ministerial duties included tracking, storing, and properly maintaining evidence.

158.     As final policy-maker for the Office of Clerk of Court of Catawba County, Defendants Hicks, Towery, and Bogle created, promulgated, and maintained the following policies which deprived Plaintiff Grimes of his constitutional rights, including but not limited to, his due process rights and the right to not be subject to improper deprivations of liberty and the pursuit of happiness:

32

(a)  Defendants created, promulgated, and maintained a policy or practice of failing to properly and reasonably inventory, organize, and safe-keep evidence;

(b)  Defendants created, promulgated, and maintained a policy or practice of not maintaining, storing, and safekeeping evidence used to subject persons to life sentences;

(c)  Defendants created, promulgated, and maintained a policy or practice of failing to make DNA evidence available to individuals upon request as required by N.C. Gen. Stat. § 15A-269;

(d)  Defendants created, promulgated, and maintained a policy or practice of failing to make evidence available for scientific testing and analysis;

(e)  Defendants created, promulgated, and maintained a policy or practice of disposing of and destroying evidence without proper authority, such as a court order issued after notice to criminal defendants and their attorneys of contemplated destruction of evidence;

(f)  Defendants created, promulgated, and maintained a policy or practice of failing to provide accurate and prompt responses to reasonable requests regarding the existence of evidence under Defendants' possession, custody, or control; and

(g)  in other respects to be proved through discovery and at trial.

159.  These Defendants improperly authorized and initiated the destruction of evidence without a court order and without first notifying Grimes or his attorney of the contemplated destruction of evidence.  The evidence that was in the possession of and under the custody of the Clerk of Court would have proved Grimes' innocence of the crimes for which he was convicted and imprisoned.

160.  Because of Defendants' misconduct, Grimes could not file a Motion for Appropriate Relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c).  Such a motion based on the DNA testing of crime scene evidence or other scientific testing such as fingerprint analysis would have been successful, and would have freed Grimes from prison.  Defendants'

33

misconduct thus violated Grimes' rights to due process and to access the courts under the Fourteenth Amendment to the United States Constitution.

161.    As a direct result of the unauthorized ministerial actions of these Defendants, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.  Defendants Hicks, Towery, and Bogle are thus liable to Plaintiff pursuant to 42 U.S.C. § 1983.

### EIGHTH CAUSE OF ACTION
**(Common Law Obstruction of Justice - All Defendants)**

162.    The allegations in the preceding paragraphs are incorporated by reference.

163.    In committing the foregoing acts and omissions, Defendants prevented, obstructed, impeded, or hindered public or legal justice, i.e., the exoneration of Grimes and the identification of the actual rapist.

164.    Defendants had in their possession evidence that would have proved Grimes' innocence of the crimes for which he was convicted and imprisoned.  Defendants failed to disclose this evidence to Grimes or his trial attorney before trial and failed to use this evidence to conduct an adequate investigation.  After the trial, Grimes and his agents repeatedly requested that he be provided access to the evidence, so that it could be subjected to DNA and other scientific forensic testing.  Defendants, through neglect, misconduct, and the adherence to unconstitutional policies, customs and practices, obstructed justice by falsely representing that the evidence was unavailable, and preventing Plaintiff Grimes from having access to evidence that would have exonerated him.  Additionally, Defendants directed and/or allowed the improper destruction of evidence without obtaining a court order and without providing notice to Grimes or his counsel.

34

165. As a direct and proximate result of Defendants' obstruction of justice, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.

## NINTH CAUSE OF ACTION
### (Negligence – All Defendants)

166. The allegations in the preceding paragraphs are incorporated by reference.

167. Defendants had the following duties:

    (a)    to ensure that citizens were not wrongfully arrested and charged with crimes they did not commit;

    (b)    to ensure that only reliable sources of evidence were used in criminal prosecutions;

    (c)    to disclose exculpatory material to criminal defendants and to ensure such material is disclosed;

    (d)    to properly maintain, store, inventory, and safe-keep evidence used in criminal prosecutions;

    (e)    to accurately respond to requests for evidence held in their possession; and

    (f)    in other respects to be proved through discovery and at trial.

168. Defendants were negligent and breached duties owed to Plaintiff Grimes in the following respects:

    (a)    Defendants failed to preserve, maintain, inventory, and safe-keep evidence;

    (b)    Defendants failed to honor reasonable requests that they search for, locate, and produce evidence for DNA and other scientific testing; and

    (c)    Defendants failed to disclose exculpatory evidence to Grimes or his trial attorney and failed to use this evidence to conduct an adequate investigation; and

    (d)    in other respects to be proved through discovery and at trial.

35

169.    As a direct and proximate result of Defendants' negligence, Plaintiff Grimes was wrongfully imprisoned for over 24 years and suffered physical, emotional, and pecuniary damages.

## TENTH CAUSE OF ACTION
### (North Carolina Constitutional Claim for Failing to Investigate and Failing to Disclose Exculpatory Evidence Before Trial - City of Hickory, Lucas, Adkins, Hunt, Bryant)

170.    The allegations in the preceding paragraphs are incorporated by reference.

171.    In committing the foregoing acts and omissions, Defendants violated Grimes' constitutional rights under the North Carolina Constitution, including but not limited to his rights under Article I, Sections 18, 19, and 21.

172.    Defendants deliberately and/or recklessly failed to disclose to Plaintiff Grimes or his trial counsel before trial that Linda McDowell was a paid informant of the Hickory Police Department and that she had been paid $1,000 for the information she provided to the Hickory Police Department; that fingerprints suitable for testing were lifted from the bananas inside Elliott's apartment and that the fingerprints did not match Grimes; and that Albert Turner was considered a suspect for the Elliott rape because he matched the initial physical description given by Elliott, had a violent criminal history, and was a regular presence in Elliott's neighborhood. Defendants knew or should have known that this evidence was exculpatory.

173.    Defendants deliberately and/or recklessly failed to investigate known exculpatory and potentially exculpatory information provided by Grimes' alibi witnesses; investigate exculpatory and potentially exculpatory forensic evidence, including but not limited to the fingerprint evidence recovered from fruit at the crime scene; and pursue evidence and leads concerning other suspects, including Turner.

36

174. Defendants' misconduct was a direct and proximate cause of Grimes' conviction and his subsequent imprisonment. Defendants were acting under color of state law and their acts were undertaken with deliberate and/or reckless indifference to Grimes' constitutional rights.

175. As a direct and proximate result of Defendants' unconstitutional acts and omissions, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.

## ELEVENTH CAUSE OF ACTION
### (North Carolina Constitutional Claim for Failing to Produce Available Exculpatory Evidence upon Request - All Defendants)

176. The allegations in the preceding paragraphs are incorporated by reference.

177. In committing the foregoing acts and omissions, Defendants violated Grimes' constitutional rights under the North Carolina Constitution, including but not limited to his rights under Article I, Sections 18, 19, and 21.

178. Defendants had in their possession evidence that would have proved Grimes' innocence of the crimes for which he was convicted and wrongfully imprisoned. Grimes and his agents repeatedly requested that he be provided access to the evidence, so that it could be subjected to DNA and other scientific testing. Defendants, through their deliberate and/or reckless misconduct, and/or due to their adherence to unconstitutional policies, customs and practices, failed to provide Grimes the evidence he requested, preventing Plaintiff Grimes from having access to evidence that would have exonerated him.

179. Because of Defendants' misconduct, which occurred while they were acting under color of state law, Grimes could not file a Motion for Appropriate Relief based on new evidence under N.C. Gen. Stat. § 15A-1415(c). Such a motion based on DNA testing of crime scene

evidence or fingerprint analysis would have been successful, and would have freed Grimes from prison.

180.    As a direct and proximate result of Defendants' unconstitutional acts and omissions, Plaintiff Grimes was wrongfully imprisoned for over 24 years, and suffered physical, emotional, and pecuniary damages.

## TWELFTH CAUSE OF ACTION
### (Liability on Official Bond – Huffman and Reid)

181.    The allegations in the preceding paragraphs are incorporated by reference.

182.    Plaintiff is informed and believes that Defendant Reid, as required by statute, has furnished a bond or bonds payable to the State of North Carolina (upon whose relation Plaintiff sues) conditioned upon the faithful exercise of the duties of his office.

183.    Plaintiff is informed and believes that Defendant John Doe Corporation was, at all times relevant to this action, the Surety on the official bond of Defendant Reid as Sheriff of Catawba County, North Carolina.

184.    Plaintiff has been injured by the neglect, misconduct, and misbehavior of Defendant Reid, acting in his capacity as Sheriff of Catawba County, and Defendant Huffman, acting in his capacity as Sheriff of Catawba County.

185.    Pursuant to N.C. Gen. Stat. § 58-76-5, Defendants and the Surety on their bond are liable to Plaintiff for all acts done by Defendant Reid or Huffman or their deputies or employees by virtue of or under color of their office.

## THIRTEENTH CAUSE OF ACTION
### (Liability on Official Bond – Hicks, Towery, and Bogle)

186.    The allegations in the preceding paragraphs are incorporated by reference.

187.     Plaintiff is informed and believes that Defendants Hicks, Towery, and Bogle, as required by statute, have furnished a bond or bonds payable to the State of North Carolina (upon whose relation Plaintiff sues) conditioned upon the faithful exercise of the duties of their office.

188.     Plaintiff is informed and believes that Defendant Jack Doe Corporation was, at all times relevant to this action, the Surety on the official bond of these Defendants as Clerk of Court of Catawba County, North Carolina.

189.     Plaintiff has been injured by the neglect, misconduct, and failure to properly perform ministerial acts of Defendants Hicks, Towery, and Bogle, acting in capacity as Clerk of Court of Catawba County.

190.     Pursuant to N.C. Gen. Stat. § 58-76-5, Defendants and the Surety on their bond are liable to Plaintiff for all acts done by these Defendants by virtue of or under color of their office.

## DAMAGES

191.     As a direct and proximate result of Defendants' violation of Grimes' civil and constitutional rights, obstruction of justice, and negligence, Grimes was arrested, deprived of a fair trial, wrongfully convicted, and imprisoned for 24 years for crimes he did not commit.

192.     As a result of Grimes' wrongful conviction and imprisonment, Grimes sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages.  Those injuries include but are not limited to:

    (a)     inadequate medical care;
    (b)     poor nutrition;
    (c)     physical pain and suffering;
    (d)     severe emotional distress;
    (e)     depression;
    (f)     humiliation, indignities and embarrassment;
    (g)     damage to reputation;
    (h)     damage to family relationships;

39

(i)      loss of employment, wages and benefits;

(j)      diminished earning capacity;

(k)     restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, family relations, sexual relations, access to media and technology, reading, travel, enjoyment, and expression; and

(l)      such other injuries as may be shown by the evidence.

193.    Defendants are jointly and severally liable to Grimes for compensatory and punitive damages resulting from the violation of his civil rights, obstruction of justice, negligence, and wrongful conduct as described herein.

194.    Grimes is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiff prays for the following relief:

1.     Compensatory damages from Defendants, jointly and severally, in an amount to be determined at trial;

2.     Punitive damages from Defendants, jointly and severally, in an amount to be determined at trial;

3.     Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988;

4.     Costs of court and interest as allowed by law;

5.     A trial by jury on all contested issues of fact;

6.     Such other and further relief as the Court may deem just and proper.

This the 8th day of October, 2014.

MARTIN & JONES, PLLC


BY:/s/ E. Spencer Parris
    E. Spencer Parris, NCSB 11042
    esp@m-j.com
    G. Christopher Olson, NCSB 21223
    gco@m-j.com
    410 Glenwood Avenue, Suite 200
    Raleigh, North Carolina 27604
    (919) 821-0005

PATTERSON HARKAVY, LLP


BY:/s/ Burton Craige
    Burton Craige, NCSB 9180
    bcraige@pathlaw.com
    Narendra K. Ghosh, NCSB 37649
    nghosh@pathlaw.com
    Paul E. Smith, NCSB 45014
    psmith@pathlaw.com
    100 Europa Dr., Suite 420
    Chapel Hill, North Carolina 27517
    (919) 755-1812

**ATTORNEYS FOR PLAINTIFF**
**WILLIE JAMES GRIMES**

41